UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMERICAN GENERAL LIFE INSURANCE COMPANY, | Index No.<br>09-CV-5428 |
| Plaintiff, | |
| -against- | |
| HANA SALAMON, JOEL KATZ, Individually and as Trustee for the HANA FAMILY TRUST, AARON KNOPFLER, Individually and as Trustee for the HANA FAMILY TRUST, and the HANA FAMILY TRUST, | |
| Defendants. | |

## PLAINTIFF AMERICAN GENERAL LIFE INSURANCE COMPANY'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

By:     Michelle M. Arbitrio, Esq.
        Wilson, Elser, Moskowitz, Edelman & Dicker LLP
        Attorneys for Plaintiff
        American General Life Insurance Company
        3 Gannett Drive
        White Plains, NY 10604

## Table of Contents

**Page**

TABLE OF AUTHORITIES…………………………………………………………………..........ii

I. PRELIMINARY STATEMENT………………………………………………………………….1

II. SUMMARY OF FACTS………………………………………………………………………...5

    A. The Insurance Policy, the Investigation and American General's Decision to Rescind the Policy……………………………………………………………………………………………5

    B. American General's Ongoing Investigation and Repeated Attempts to Stop Premium Payments …………………………………………………………………………………………..7

    C. The Instant Motion…………..…………………………………………………………………10

III. ARGUMENT……………………………………………………………………………………..11

    A. Summary Judgment Should Be Denied Because the Defendants Cannot Demonstrate a Lack of Material Issues of Fact…………………………………………………………………...11

    B. At All Times, American General's Actions Were Consistent With Its Intention to Rescind the Policy……………………………………………………………………………………………11

        1. American General's Immediate Steps to Investigate and Disclaim the Policy Based on Credible Evidence of Fraud Proves that American General Did Not Ratify the Policy…………………………………………………………………………...……11

        2. American General Did Not Waive Its Right to Rescind by Inadvertently Accepting Premiums……………………………………………………………………...…………..…16

            a. The Defendants Have Not Demonstrated American General's Intent to Waive the Right to Rescind as Required Under New York Law……...…16

            b. American General's Acceptance of One Premium Payment was Inadvertent and is Not a Basis for Finding Waiver………………………………………....18

    C. Gamesmanship should not be Tolerated by This Court………………………...…………….21

    D. This Case is Not Ripe for Summary Judgment………………………………………….....22

    E. Even if the Court Granted this Motion, the Case would Continue with Regard to the Punitive Damages Claim …………………………………………………………………………….…..22

IV. CONCLUSION…………………………………………………………………………………..23

## Table of Authorities

**Cases**                                                                                     **Page**

Alvarez v. Prospect Hosp., 68 N.Y. 2d 320 (1986)…………………………………………..…11

American International Specialty Lines Ins. Co. v. Towers Financial Corporation et. al.,
198 B.R. 55 (S.D.N.Y. 1996)……………………………………………………………………….18

Berger v. Manhattan Life Insurance Co. et. al, 805 F. Supp. 1097 (S.D.N.Y. 1992)……………18

Chicago Insurance Company v. Kreitzer & Vogelman, et. al, 265 F. Supp. 335 (S.D.N.Y.
2003)…………………………………………………………………………………………...14,15,16,21

Continental Insurance Company v. Helmsley Enterprises, Inc., 211 A.D.2d 589,
622 N.Y.S.2d 20 (1st Dept. 1995)……………………………………………………………….…17

Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,
756 F.2d 230, 236 (2d Cir. 1985……………………………………………………………………11

In re Nig. Charter Flights Contract Litig., 520 F. Supp. 2d 447, 466 (E.D.N.Y. 2007)…...…12,16

Metropolitan Life Insurance Company v. Adolf O. Blum, 7 A.D.2d 488 (1st Dept. 1959)…..18,19

Prudential Insurance Company of America v. Brown et al. 30 Misc. 2d 147 (Sup. Westchester
County 1961)…………………………………………………………………………………...…..19

Republic Ins. Co. v. Masters, Mates & Pilots Pension Plan, 77 F.3d 48 (2d Cir. 1996)……...…14

Rosenthal v. National Life Ins. Co., 486 F. Supp. 1018, 1021 (S.D.N.Y. 1980)……………..…..11

S.E.C. v. Credit Bancorp, Ltd. 147 F. Supp. 2d 238 (S.D.N.Y. 2001)……………………13,14,16

Scalia v. Equitable Life Assurance Society of the United States, 251 A.D.2d 315, 673 N.Y.S.2d
730 (2nd Dept. 1998)……………………………………………………………………….……17

The Aetna Casualty and Surety Co. v. Retail Local 906 of the AFL-CIO Welfare Fund, 921 F.
Supp. 122 (S.D.N.Y. 1997)……………………………………………………………………14

Transmarittina Sarda Italnavi Flotte Ruiniti S.p.A. v. Foremost Ins. Co., 482 F. Supp. 110
(S.D.N.Y. 1979)……………………………………………………………………….……17

Travelers Insurance Company v. Pomerantz et al. 246 N.Y 63 (1927)……………………………19

2844645.1

Water Transport Company v. Boston Towing& Transportation Company, Inc., 1994 U.S. Dist.
LEXIS 4222 (S.D.N.Y 1994)…………………………………………………………………….17

Zeldman v. Mutual Life Insurance Company of New York, 269 A.D. 53, N.Y.S. 2d 792 (1st
Dept. 1945)…………………………………………………………………………………..……..15

## PRELIMINARY STATEMENT

American General Life Insurance Company ("American General") brought this action to rescind a life insurance policy, with a face value of $8.5 million, based on material misrepresentations contained in the policy application of the insured, Hana Salamon. American General's claim for rescission is based on facts learned during a preliminary investigation that revealed several misrepresentations in Salamon's life insurance application and raised suspicion that the policy was purchased as part of a Stranger-Owned Life Insurance ("STOLI") scheme. STOLI schemes involve the sale of a life insurance policy to a third party in exchange for an immediate cash benefit and often utilize an elaborate network of parties to perpetrate a fraud through the fabrication of financial documents. In addition to the fact that any policy purchased by way of material misrepresentations is voidable, any policy purchased through a STOLI scheme is considered void *ab initio*, and in violation of New York insurance law, due to a lack of insurable interest in the life of the Insured. In light of serious public policy concerns regarding investments where strangers wager on the life of an insured, anyone who perpetrates a fraud such as a STOLI scheme is liable for punitive damages.

There is no question that a complex, pre-meditated fraud involving many players occurred in this matter. On Salamon's life insurance application, she listed an earned income of "$150,000 + $320,000," a household income of "$470,000," and a net worth of "$14 million." Similarly, in a separate "Financial Questionnaire" section of the application, she listed an earned income of $150,000 from art sales; an unearned income of $320,000 from interest, dividends and real estate; a total income of $470,000; and a net worth of $14 million. When an investigator contacted Salamon prior to issuing the Policy to confirm her liquid net worth, she informed him that she owned two 16 unit apartment complexes in Brooklyn, New York, with an estimated $12

1

million cumulative market value and that she owned a primary residence valued at $750,000. Net worth and property ownership database searches under Salamon's name and her husband's name (Martin Salamon), conducted after the policy was issued, did not indicate ownership of *any* real estate. Also, in a separate life insurance application to another insurer that Salamon submitted at or about the same time, she listed a different net worth than that listed on her American General application.

When asked in a rescission letter, and during the course of this litigation, to produce evidence that the financial representations in the application were accurate, Salamon has come up empty.  Counsel for the defendants (the "Schindel Farman firm") have conceded that Ms. Salamon does not own the Brooklyn properties as reported during the application process, but maintains that it is acceptable to provide insurers with false information during the application process so long as the falsification is not in the application itself. The Schindel Farman firm also maintains that, although Salamon admittedly does not own two apartment buildings in Brooklyn, she owns property in Romania worth $7 million, which validates the financial net worth listed in her policy application. When put to task by this Court to provide documentary evidence of this so-called Romanian property, the Schindel Farman firm exchanged further false information. Namely, defendants produced an un-translated Romanian document that was suppose to confirm, once and for all, that Salamon is worth $14 million as indicated on her application. However, when a Romanian lawyer translated the elusive document provided by Salamon, the document did not even state that Salamon owned Romanian property. To add to the already mounting evidence of fraud, the Schindel Farman firm provided a conversion table with the Romanian document that misrepresented that 18 million Romanian Lei is equal to 7 million U.S. dollars. When Wilson Elser investigated the conversion rate, it learned that the Romanian Lei was

2

revalued in 2005 and that as such, <u>18 million Romanian Lei are only worth a mere</u> <u>500 U.S.</u> <u>Dollars</u>. As if there weren't enough evidence of fraud already, Salamon's production of this document during this litigation, along with the false representation of the value indicated in the document, is further evidence that a fraud was committed.

American General has no other goal in this litigation than to determine if this policy was fraudulently obtained and whether it was part of a larger insurance fraud; a goal which serves the general public. American General has repeatedly expressed its willingness to discontinue this case if it is presented with reliable and accurate information demonstrating that no fraud was committed and the representations contained in the policy were true. Counsel for the defendants' refusal to submit such proofs only serves to discredit the defendants' denials that this policy was purchased as part of a STOLI scheme and counsel's continued gamesmanship suggests a potential involvement in the overall scheme.

It is clear that the defendants are using this motion to delay discovery and avoid exposure of their fraud by attempting to capitalize on a technicality of New York insurance law that has no application here. Although there are numerous issues of fact, the defendants are attempting to invoke an inapplicable legal technicality to ensure that American General will never have an opportunity to root out STOLI players through the discovery process, and that this Court will never get the chance to adjudicate the substantive allegations of fraud.

As discussed in detail below, defendants allege that American General is precluded from rescinding the insurance policy, despite clear evidence of fraud, because it accepted one premium payment after the commencement of this litigation. According to defendants, the acceptance of one premium payment after the commencement of a litigation is a violation of a common law rule in New York that results in waiver of the right to rescind. However, according

to controlling cases, for the waiver rule to apply, American General must have ***intended*** to waive its right. The evidence indicates that American General did not intend to waive its right.

Further, even if the legal technicality were applicable, the issue is ***not ripe*** because American General has not had an opportunity to seek discovery related to this issue. As discussed below, it appears that the Schindel Farman firm and plaintiff are aware of American General's mainframe system difficulty from past experience defending insurance fraud cases with American General, and intentionally set up American General by paying premiums, in order to invoke this technical rule. This is clear because, as soon as defendants Answered in this matter, American General immediately sent an agreement to defendants to cease paying premiums. Rather than enter into an agreement to cease paying premiums, defendants brought this motion for dismissal. Of course, the Court would condemn gamesmanship of this nature if American General had the opportunity to obtain discovery to establish that gamesmanship occurred. However, American General has not had the opportunity to conduct discovery and, in fact, because defendants have not exchanged any discovery to date in this case. For this reason, American General requires discovery and this matter is not ripe for summary judgment.

As demonstrated below, the legal technicality on which the defendants rely is not applicable to the facts of this case. Defendants are simply attempting to evade discovery and avoid an adjudication of this case on the merits. Further, even if the technicality were applicable, the issue is not ripe because American General has not had the opportunity to obtain discovery relating to the issue, particularly regarding defendants' gamesmanship. As such, American General respectfully asks this Court to deny the defendants' motion for summary judgment so that this Court may adjudicate the substantive allegations of fraud.

4

## SUMMARY OF FACTS

A.    The Insurance Policy, the Investigation and American General's Decision to Rescind the Policy

On December 28, 2007, American General issued Flexible Premium Adjustable Universal Life Insurance Policy No. U10022254L (the "Policy") with a death benefit of $8.5 million to the Hana Family Trust (the "Trust"), insuring the life of Hana Salamon ("Ms. Salamon" or the "Insured"). A copy of the Policy is attached to the Affirmation of Aaron Knopfler ("Knopfler Aff.) as Exhibit E. American General issued the Policy based on an application completed and executed by Hana Salamon on December 20, 2007 (the "Application"). Id. Question 1 on Part A of the Life Insurance Application requested that defendant Hana Salamon set forth her personal earned income, household income and net worth. Id. In response to Question 1, defendant Hana Salamon reported her personal earned income as $150,000 - $300,000, her household income as $470,000, and her net worth as $14 million. Id. On a separate "Financial Questionnaire" section of the Application, Ms. Salamon listed an earned income of $150,000 from art sales; an unearned income of $320,000 from interest, dividends and real estate; a total income of $470,000; and a net worth of $14 million. Id. Ms. Salamon also listed her reason for purchasing $8.5 million in life insurance as "estate preservation." Id.

In late 2007, when an investigator from Infolink Inspection Reports, an investigative agency retained by American General, contacted Ms. Salamon prior to the issuance of the Policy to confirm her liquid net worth, she informed him that she is the owner of two 16-unit apartment complexes in Brooklyn, New York, with an estimated $12 million cumulative market value. See Exhibit 1 to the Declaration of Michelle Arbitrio. The Infolink Report also indicates that Ms. Salamon reported owning a primary residence valued at $750,000. Id.  The Policy was issued in

2830016.1

part based on, among other things, these representations. Following the issuance of the Policy, further investigation in 2008 revealed that: (1) contrary to her representations, Ms. Salamon may not own any property whatsoever since net worth and property ownership database searches under Hana Salamon and her husband did not indicate ownership of <u>any</u> real estate; (2) Ms. Salamon misrepresented her other insurance coverage on her application; (3) Ms. Salamon might have misrepresented her heath status and (4) that Ms. Salamon might have slightly altered her date of birth and social security number on her policy application; a common trick used in STOLI schemes to avoid cross-referencing and detection of fraudulent misrepresentations. American General immediately tried to reach out to Ms. Salamon and other relevant parties to verify the veracity of these recommendations. A selection of communications evidencing several of these attempts is attached as <u>Exhibit 4</u> to the Arbitrio Dec.

On the basis of this preliminary investigation, American General determined that it had grounds to rescind the Policy. As such, American General sent a letter to Ms. Salamon, dated February 5, 2009, seeking a voluntary rescission. A copy of the rescission letter is attached to the Affidavit of Hana Salamon at <u>Exhibit D</u>. In relevant part the letter stated:

> "Due to material misrepresentations in the Application and in accordance with the incontestability provision of the Policy, **American General is rescinding the Policy, which is hereby voided and not in effect. Any applicable premium will be refunded to the policy owner.**
>
> …
>
> **If you have any information that you feel would affect American General's decision, please submit it to me by March 5, 2009.**
>
> …
>
> It should be noted that **the investigation in this matter is ongoing**, and in sending this letter, American General is not limiting its rescission to the reasons outlined in this letter. American General reserves the right to supplement this letter as additional information is uncovered. **American General reserves its**

**rights, remedies and defenses and does not intend to waive any such matters with respect to any further action that may be taken on the Policy**." (emphasis added).

B. American General's Ongoing Investigation and Repeated Attempts to Stop Premium Payments

Even after sending the rescission letter, American General remained committed to resolving this matter without resorting to court intervention. American General continued its investigation and provided the defendants ample time to clarify the representations made on the Application and provide documentary proof that the representations were truthful and accurate. American General never received any response from the defendants. American General provided the defendants with as much as time as it could to avoid unnecessary litigation before it was forced to commence this lawsuit at the expiration of the contestability period to avoid preclusion on December 11, 2009. The investigation regarding the truth of the representations in the complaint was – and still is – ongoing. Neither the mailing of the rescission letter nor the commencement of this lawsuit has ended the investigation. In fact, if American General receives adequate proof that Ms. Salamon's representations are accurate, it has repeatedly communicated a willingness to withdraw the lawsuit.

Since the rescission letter was sent in February 2009, American General has intended to stop the acceptance of premium payments in accordance with its decision to seek rescission. Despite a clear intent to seek rescission of the Policy, due to complications and intricacies of the policy administration process and American General's mainframe systems, American General could not effectively rescind the Policy until the matter was resolved through the court system or otherwise. *See* Affidavit of Gerald Harryman, dated July 16, 2010 ("Harryman Aff"). As such, during the pendency of the investigation and ensuing litigation, the defendants were seemingly able to make <u>one</u> premium payment on the Policy, four days after the rescission letter was issued.

The reason that American General's systems are not designed to automatically reject or refund premium during the pendency of a rescission action is because to do so could be extremely burdensome to American General and potentially detrimental to the policyholder in the event that the court were to deny American General's request for a declaration of rescission. Harryman Aff ¶ 4. Throughout the life of a policy, American General's electronic administrative systems automatically perform complex calculations and adjust policy values according to the policies' terms based upon numerous constantly changing economic variables. Harryman Aff ¶ 5. In order for funds to be automatically returned to American General, it would be required to code the policy as terminated or suspended and the calculations necessary to maintain the policy value would cease. Id. In the event that a court later ruled that US Life is not entitled to rescission, American General would be required to attempt to recreate the complex calculations manually – a time consuming and costly process – and American General could not guaranty that the policy values would be the same as if the policy had not been terminated or suspended. Id. Therefore, American General allows the policy to remain "active" in the mainframe system until litigation is concluded. At all relevant times, however, American General remains committed to the return of all applicable premiums for any policy that is rescinded.

Nevertheless, understanding the lock box issue, American General has had success in previous actions obtaining a voluntary concession from the owner of the policy to stop sending premium payments. Any attempt to obtain such a voluntary concession from the defendants in this case was met with great difficulty and utter defiance.

It should be noted that, as soon as the defendants made contact with American General regarding this matter, American General immediately requested that the defendants stop issuing

premium payments. The relevant time line is as follows: American General sent a rescission letter in February 2009, and allowed defendants until December 2009 to provide information to validate the insurance policy. Defendants failed to respond. In December 2009, when faced with the expiration of the contestability period, American General filed this lawsuit. By January 2010, American General had served all defendants. Again, defendants failed to respond. The defendants were in default until  March 3, 2010 when the Schindel Farman firm filed an appearance in the case, right before American General was about to move for a default against the defendants for failure to answer the complaint. As soon as American General became aware that the Schindel Farman firm represented the defendants, it repeatedly requested that the Defendants enter into a written agreement to stop sending premiums. These efforts were repeatedly ignored by the defendants. Despite the defendants refusal to enter into such an agreement, it is not believed that any premium payments were made beyond the payments made on February 9, 2009, just days after the rescission letter was sent and possibly before Ms. Salamon even received the rescission letter.

American General has also made repeated attempts to reach out to the Schindel Farman firm to obtain any evidence that the defendants possess to validate the representations made on the policy application in an effort to avoid unnecessary litigation. The Schindel Farman Firm made numerous representations to American General and to the Court that such evidence exists, but at the same time made every effort to avoid producing such evidence. Specifically, the Schindel Farman firm made repeated representations that, though Ms. Salamon may not own the Brooklyn properties as originally represented during the life insurance application process, she does own property in Romania worth approximately 7 million dollars, a value that the Schindel Farman firm argues will more than validate her net worth and other financial representations.

However, despite repeated requests for any documents that would demonstrate Ms. Salamon's ownership in this alleged property – tax returns, deeds, contracts for sale, etc. – the Schindel Farman firm continued to refuse such requests, raising further suspicion that no such proof existed and that this policy was, in fact, purchased as part of a STOLI scheme. Finally, by way of court order dated May 27, 2010, the Schindel Farman firm was forced to produce any evidence of property ownership. The Schindel Farman firm provided such "proof" in the form of an un-translated Romanian document accompanied by a printout from an internet currency conversion tool which purported to demonstrate that Ms. Salamon owned property in Romania worth approximately 7 million dollars. See Exhibit 8 to Arbitrio Dec. However, when American General obtained a translation of the document and conducted its own investigation into the veracity of the document, it learned that the "proof" was not proof of anything and that the representations made by counsel for the defendants was blatantly false! Not only did the document fail to demonstrate ownership in property (it was merely a document awarding legal fees), but that the value that the Schindel Farman firm represented was worth $7 million US dollars -- 18 Romanian Lei -- was actually worth approximately $500 US dollars due to a revaluation of the Romanian Lei in 2005. Id.

C. The Instant Motion

    After appearing in the action, the defendants conveniently moved right away to have discovery stayed while it requested leave to file a motion for summary judgment. The instant motion was filed on July 1, 2010 before any discovery could take place and despite the defendants' utterly false and misleading effort to provide proof of property ownership. At this point, American General's suspicions that a fraud occurred here are mounting and American General is no longer interested in disposing of this matter until it has learned the truth, rooted out

potential players and repeat offenders through the discovery process, and ensured that any fraud that may have occurred in procuring this Policy does not extend to a larger STOLI scheme.

## ARGUMENT

### A. Summary Judgment Should Be Denied Because the Defendants Cannot Demonstrate a Lack of Material Issues of Fact

"While summary judgment is a valuable procedural device for promptly disposing of actions in which there is no genuine issue as to any material fact, it is also a drastic remedy that cuts off the right to have one's day in court. The harshness of the remedy is exacerbated when the trial court refuses to allow [a party] to conduct discovery." Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 756 F.2d 230, 236 (2d Cir. 1985)(internal citations omitted). As such, in deciding a motion for summary judgment, the Court must draw all reasonable inferences and resolve all ambiguities in favor of the party who opposes summary judgment. Rosenthal v. National Life Ins. Co., 486 F. Supp. 1018, 1021 (S.D.N.Y. 1980). The burden is on the moving party to demonstrate the absence of any triable issue of material fact. Id. Failure to make such a showing mandates denial of the motion, regardless of the sufficiency of the opposition papers. Alvarez v. Prospect Hosp., 68 N.Y. 2d 320 (1986).

### B. At All Times, American General's Actions Were Consistent With Its Intention to Rescind the Policy.

#### 1. American General's Immediate Steps to Investigate and Disclaim the Policy Based on Credible Evidence of Fraud Proves that American General Did Not Ratify the Policy.

The defendants' contention that American General's failure to rescind the Policy for 22 months after it received knowledge of a basis for rescission constitutes a ratification of the Policy as a matter of law is baseless. As discussed below, ratification is a legal principle that requires intention and full knowledge of the material facts. American General could not be found to have

11

ratified the policy because its actions are utterly inconsistent with intent to ratify the Policy and, due to an on-going investigation, American General <u>still</u> does not have full knowledge of the material facts. American General has been conducting an investigation since January 2008 which can be demonstrated by the investigative file, documents which the defendants have not sought through discovery yet. The February 2008 correspondence between the investigator and Ms. Salamon on which the defendants base their claim that American General had full knowledge of Ms. Salamon's misrepresentations twenty-two months before commencing this action is just one small part of the beginning of a special investigation by American General into a potential STOLI scheme. The defendants' contention that the mere existence of this correspondence serves as a bar to relief, without conducting any discovery as to the facts and circumstances surrounding the time period of that correspondence and the context of that correspondence in the broader investigation, is not only a premature and unreasonable conclusion, but it ignores the very legal basis behind the principle of ratification.

"Ratification must be performed with full knowledge of the material facts relating to the transaction and the assent must be clearly established and may not be inferred from doubtful or equivocal acts or language." <u>In re Nig. Charter Flights Contract Litig.</u>, 520 F. Supp. 2d 447, 466 (E.D.N.Y. 2007). Discovery would reveal that American General took immediate action to investigate the veracity of the representations made by Ms. Salamon, a process which perhaps took longer than the defendants would have liked, but certainly an insurance company has a right and a duty to conduct a full investigation to ensure it has a valid basis for rescission before it resorts to legal action. The preliminary investigation taking place in early 2008 was not conclusive; it merely raised red flags that there *may* have been inconsistencies in the policy application.

12

Both cases cited by the defendants in support of their theory of ratification are inapposite. In <u>S.E.C. v. Credit Bancorp, Ltd.</u> 147 F. Supp. 2d 238 (S.D.N.Y. 2001), the court concluded that the insurer had ratified the insurance policy based on the fact that the insurer accepted premiums, negotiated endorsements, redrafted marketing and business documents and even engaged in the annual re-signing of the policy after learning of the fraud that had taken place. The court, however, only came to this conclusion after significant discovery had taken place to ensure that there was no factual dispute whatsoever that the insurer was fully aware of fraud while it continued to conduct itself as if it did not object to the fraud. <u>Id</u>. Thus, the underlying facts of <u>S.E.C. v. Credit Bancorp, Ltd.</u> can be distinguished from this case in two ways. First, no discovery has been conducted in this case at all, not even regarding the facts and circumstances surrounding American General's fraud investigation or the events leading up to the commencement of this action, facts which are crucial to their argument for ratification. The court in <u>S.E.C. v. Credit Bancorp, Ltd</u>. clearly stated that in order to determine whether a policy has been ratified, the "key factors are whether the party silently acquiesced in the contract or rather promptly interposed his objections upon discovery the basis for the claim of rescission." <u>Id</u>. at 256 (internal citations omitted). Thus, the first flaw in the defendants' theory of ratification is that they have no basis for claiming that American General silently acquiesced in the contract because they have not obtained any discovery regarding American General's knowledge or conduct around that time period. Viewing the February correspondence in their possession in isolation without understanding its context in the broader investigation and resulting actions taken by American General is misleading this Court to believe that there is no issue of fact here when issues of fact clearly exist.

13

The second point of distinction between this matter and S.E.C. v. Credit Bancorp, Ltd. is that the insurer in that case took affirmative steps to ratify the policy even with clear knowledge of fraud and grounds for rescission. Not only did the insurer in S.E.C. v. Credit Bancorp, Ltd. fail to promptly disclaim the policy after it learned of potential fraud for two years, but it actually took affirmative steps to renew the policy annually. Though the factual record in this case has not been developed whatsoever, even the factual record at this time demonstrates that American General took immediate, affirmative steps to investigate the fraud, to obtain a voluntary rescission of the policy as soon as it had sufficient grounds for rescission and to commence this action. These actions were precisely the prompt response and decisive action that is required under the law to respond to potential fraud and grounds for rescission of an insurance policy. These actions put Ms. Salamon on notice first that the policy was being investigated, then that the policy was rescinded, set forth the basis for rescission, declared the policy void and invited Ms. Salamon to submit proof to refute the allegations of fraud. See Exhibit D to the Salamon Aff.  In no way did American General acquiesce in the contract. Id. It rescinded the policy promptly after learning of potential fraud. Id. The 10 months that expired before an action was filed was merely American General's attempt to give the insured an opportunity to submit proof to the contrary and avoid unnecessary litigation while it continued its investigation.

There is no question that insurance companies are entitled to conduct a comprehensive investigation into evidence of fraud before it takes action to rescind a policy. Republic Ins. Co. v. Masters, Mates & Pilots Pension Plan, 77 F.3d 48 (2d Cir. 1996); The Aetna Casualty and Surety Co. v. Retail Local 906 of the AFL-CIO Welfare Fund, 921 F. Supp. 122 (S.D.N.Y. 1997). The defendants have not offered any evidence that the length of this investigation was unreasonable. In Chicago Insurance Company v. Kreitzer & Vogelman, et. al, 265 F. Supp. 335 (S.D.N.Y.

2003), the court acknowledged that an insurance company is entitled to a reasonable investigation into evidence of material misrepresentations, even if it is a lengthy investigation. Specifically, the court held that:

> "Indeed, public policy supports the allowance of such a reasonable investigation; it would be unwise to give insurers an economic incentive to rescind insurance at the drop of a hat without sufficient investigation. Such willy-nilly actions would obviously result in less insurance coverage, but also would engender countless lawsuits such as this one."

Id. at 344. Along these lines, American General is entitled to investigate a potential fraud and cannot be estopped from pursuing a rescission action while the investigation is still ongoing, especially when the defendants have failed to cooperate in their own defense or provide information supporting the representations in the policy application.

The only other case cited by the defendants in support of their ratification argument, Zeldman v. Mutual Life Insurance Company of New York, 269 A.D. 53, N.Y.S. 2d 792 (1st Dept. 1945), is also irrelevant to the facts of this case. The court in Zeldman only surmised that if an insurance company deliberately disregarded notice sufficient to raise suspicion, then an inference might be permitted that the insurance company intentionally waived its rights to take action to void the policy. This holding is consistent with the principles of waiver and ratification but again, the facts of this case do not support a finding that American General deliberately disregarded notice of a potential fraud. In fact, the facts support an opposite conclusion. Other than the inadvertent acceptance of premium which will be explained at length below, there is no inference to be suggested that American General silently acquiesced in the Policy. If anything, the factual record at this time demonstrates that American General took immediate action to disclaim and rescind the Policy.

15

In the least, without conducting discovery as to when and how American General learned of the potential fraud, when and how American General made the determination to rescind the Policy, the reason why American General inadvertently accepted premiums and what actions American General took (or didn't take) from the time the Policy was purchased and the commencement of this action, the defendants' motion for summary judgment is premature at best. Exhibit 1 to the Arbitrio Dec. is proof alone that discovery is needed to uncover the facts and circumstances surrounding American General's actions to disclaim the Policy. Exhibit 1 not only shows that American General's investigation was in-depth and ongoing, but that the defendants have utterly failed to develop the factual record whatsoever because the scant facts available to them now suits their own agenda. See In re Nig. Charter Flights Contract Litig., supra (if there are disputed issues of material fact, the question of ratification is one for the jury).

**2. American General Did Not Waive Its Right to Rescind by Inadvertently Accepting Premiums**

> **a. The Defendants Have Not Demonstrated American General's Intent to Waive the Right to Rescind as Required Under New York Law**

The defendants' second basis for summary judgment is an argument that American General's acceptance of one premium payment four days after the rescission letter was sent to Ms. Salamon constitutes a waiver of its right to rescind the Policy. This argument is unfounded in law and in fact. Waiver is the voluntary and intentional relinquishment of a known right that requires evidence of a clear manifestation of intent. Waiver cannot be "lightly inferred." See Chicago Insurance Company v. Kreitzer & Vogelman, et. al, supra. American General has not waived its right to rescind, because it has not demonstrated the requisite intent to waive its right. In fact, American General has taken swift and immediate steps to disclaim the Policy as is evident from its ongoing investigation into the alleged misrepresentations, the efforts to obtain a

16

voluntary rescission of the Policy and the commencement of this action. This conduct is utterly inconsistent with an intention to waive American General's right to rescind the policy. Furthermore, the rescission letter specifically stated that American General did <u>not</u> intend to waive any rights; language which is sufficient to protect a party's right to rescind. <u>See</u> <u>Water Transport Company v. Boston Towing& Transportation Company, Inc.</u>, 1994 U.S. Dist. LEXIS 4222 (S.D.N.Y 1994)(court cites to explicit language contained in a letter preserving an insurance company's rights in holding that the insurance company cannot be found to have waived its rights under the contract)[1]. Lastly, in this case, where American General's fact investigation was – and still is – ongoing (and the rescission letter so stated), it has not waived its right by accepting premium payments. In the least, a finding of intent is necessarily an issue of fact that can not be determined on a motion for summary judgment. <u>Transmarittina Sarda Italnavi Flotte Ruiniti S.p.A. v. Foremost Ins. Co.</u>, 482 F. Supp. 110 (S.D.N.Y. 1979).

The case law cited by the defendants in support of their waiver argument is based on the principle that a party cannot both accept premiums and reserve its right to rescission because of the lack of mutuality and timeliness. <u>See</u> <u>Continental Insurance Company v. Helmsley Enterprises, Inc.</u>, 211 A.D.2d 589, 622 N.Y.S.2d 20 (1st Dept. 1995); <u>Scalia v. Equitable Life Assurance Society of the United States</u>, 251 A.D.2d 315, 673 N.Y.S.2d 730 (2nd Dept. 1998). It

---

[1] Specifically, the letter at issue stated: "Please be advised that the above enumeration of reasons shall not be construed as a waiver or relinquishment of any rights that the Royal Insurance Company holds under its policy of insurance…The Royal Insurance Company does not intende to waive or relinquish any rights that it holds under its policy of insurance. No acts or omissions of Royal Insurance Company, its agents, servants or employees shall be so construed." <u>Water Transport Company v. Boston Towing& Transportation Company, Inc.</u>, 1994 U.S. Dist. LEXIS at *16-17. This language is analogous to the language of American General's rescission letter which stated: "It should be noted that the investigation in this matter is ongoing, and in sending this letter, American General is not limiting its rescission to the reasons outlined in this letter. American General reserves the right to supplement this letter as additional information is uncovered. American General reserves its rights, remedies and defenses and does not intend to waive any such matters with respect to any further action that may be taken on the Policy." <u>See</u> Exhibit D to the Salamon Aff.

is important to note that both of these cases were cited by the defendants but the underlying decisions of both cases are unpublished. As such, American General cannot speak to the underlying facts of these cases and asks the Court to disregard the factual comparisons that the defendants draws from these cases to this case.

Nonetheless, the basis behind the lack of mutuality argument is that a party cannot both disclaim a contract and simultaneously reap the benefits of that contract. However, American General's actions have been consistent with an effort to disclaim the Policy and return all applicable premiums. The rescission letter clearly stated that applicable premium would be returned and American General's position has never waivered that if rescission is granted, applicable premiums would be returned to the defendants. According to New York law, premiums do not have to be tendered to the insured prior to trial.  Berger v. Manhattan Life Insurance Co. et. al, 805 F. Supp. 1097 (S.D.N.Y. 1992); American International Specialty Lines Ins. Co. v. Towers Financial Corporation et. al., 198 B.R. 55 (S.D.N.Y. 1996).

### b. American General's Acceptance of One Premium Payment was Inadvertent and is Not a Basis for Finding Waiver

The only evidence that the defendants offer to support their argument of waiver is American General's acceptance of one premium payment mere days after the rescission letter was sent to Ms. Salamon. Again, without having conducted extensive discovery regarding the facts and circumstances regarding the acceptance of premiums, the facts asserted by the defendants are conveniently incomplete at best. In fact, American General's acceptance of that single premium payment was inadvertent, unintentional and American General has consistently proclaimed a willingness to return any and all premiums paid on the Policy. See Exhibit D to the Salamon Aff.  New York case law is clear that inadvertent acceptance of premium does not serve as a bar to rescission. In Metropolitan Life Insurance Company v. Adolf O. Blum, 7 A.D.2d 488

(1st Dept. 1959), the Court held that acceptance of a premium after an insurer seeks to rescind a policy does not establish that the insurer intentionally relinquished the right to contest or rescind the policy. "Negligence or oversight is not enough to establish waiver. [The insurance company's] intention to waive is an indispensable constituent of waiver." Id. at 491. Other courts have reached similar results with respect to a large corporation's continued acceptance of premiums after it affirmatively takes action to rescind a policy. See Travelers Insurance Company v. Pomerantz et al. 246 N.Y 63 (1927)(court recognized that an insurance company's failure to return premiums despite its continued efforts to proceed with its claim for rescission was not evidence of an intention to abandon its claim of rescission and to ratify the policy); Prudential Insurance Company of America v. Brown et al. 30 Misc. 2d 147 (Sup. Westchester County 1961)(an insurer cannot be found to have intended to waive a right to rescind a policy merely because of negligent error).

    As discovery would reveal if summary judgment were denied, American General's acceptance of one premium payment was inadvertent and due to a combination of factors including a third party's management of its deposit system and its own electronic tracking system As discovery would reveal if summary judgment were denied, US Life's continued acceptance of premiums was inadvertent and due to a combination of factors related to its administrative and mainframe systems.  Harryman Aff. at ¶ 4, 5.  Presently, due to the complex nature of the policy at issue, a policy must remain in full effect in order to preserve the value of the policy and maintain the status quo pending litigation. Harryman Aff. ¶ 4. The reason that US Life's mainframe systems are not designed to automatically reject or refund premium during the pendency of a rescission action is because to do so could be extremely burdensome to US Life and potentially detrimental to the policyholder in the event that the court were to deny US Life's

19

request for a declaration of rescission. Harryman Aff ¶ 4.  This is due to the fact that the manner in which a policy is maintained involves a process by which US Life's electronic administrative systems automatically perform complex calculations and adjust policy values according to the policies' terms based upon numerous constantly changing economic variables. Harryman Aff ¶ 4, 5. In order for funds to be automatically rejected by US Life, US Life would be required to code the policy as terminated or suspended and the calculations necessary to maintain the policy value would cease. Id. In the event that a court later ruled that US Life is not entitled to rescission, US Life would be required to attempt to recreate the complex calculations manually – a time consuming and costly process – and US Life could not guaranty that the policy values would be the same as if the policy had not been terminated. Id. Therefore, US Life allows the policy to remain "active" in the mainframe system until litigation is concluded. Id.

The intricacies of US Life's administrative and mainframe systems, however, do not have any bearing on US Life's continued intent to rescind a policy once it has determined that it has grounds for rescission and its inability to terminate the policy and its inability to reject premium during the pendency of litigation are not inconsistent with this continued intent to rescind. Clearly the issues related to American General's internal and third-party's systems bar its ability to return premiums during the pendency of an action, but in no way can these issues be mistaken as an intentional relinquishment of American General's right to rescind the policy. As quoted above, American General's rescission letter clearly stated that it was rescinding the Policy, that American General would refund any applicable premium and, most importantly, the fraud investigation is still ongoing and that American General reserves its rights, remedies and defenses and does not intend to waive any such matters with respect to any further action that

may be taken on the Policy. This language certainly contradicts a finding that American General intentionally relinquished its right to rescind while the fraud investigation continued.

Lastly, in Chicago Insurance Company v. Kreitzer & Vogelman, et. al, supra, the court rejected the defendant's argument that the insurance company waived its ability to rescind the policy by accepting a premium payment after the insurance company had knowledge of a basis for rescission. The court focused on what knowledge the insurance company actually had at the time it accepted premium, whether this was deemed "sufficient knowledge" to implicate waiver, and acknowledged that an insurance company is entitled to a reasonable investigation into evidence of material misrepresentations, even if it is a lengthy investigation. No discovery has been conducted as to the knowledge of American General at the time it accepted the single premium payment. As such, summary judgment is premature at best.

**C. Gamesmanship should not be Tolerated by This Court**

At every step of this litigation, the defendants have exhibited gamesmanship. Certainly, the defendants have been eager to dispose of this case and prevent any real discovery from taking place. The Schindel Farman firm is well-versed in this area of law, has significant experience litigation similar cases and has obtained a lot of discovery about American General and its systems in other cases. Thus, it is still presently unknown whether the defendants were instructed by counsel to continue making premium payments on purpose to set themselves up for this dispositive motion.

Further, as discussed above, the Schindel Farman firm provided false evidence – after the commencement of this litigation and in response to a court order – which further adds to the suspicions of overall fraud as well as the gamesmanship employed in this litigation. This case involves serious indications of fraud here and American General deserves an opportunity to

21

conduct discovery and determine if a fraud was perpetrated not only in this case, but potentially on a larger scale as well.

As such, American General respectfully requests that the defendants' motion for summary judgment be denied to allow for discovery to proceed, the truth to be revealed, and the merits of this case to be decided by this Court at a later date.

**D.**     **This Case is Not Ripe for Summary Judgment**

The defendants have strategically moved for summary judgment before American General has had the opportunity to conduct any discovery, because it appears that the defendants are attempting to evade any inquiry into conduct relating to this matter or, more likely, defendants are attempting to avoid the discovery of suspected relationships with other STOLI players.

**E.**     **Even if the Court Granted this Motion, the Case would Continue with Regard to the Punitive Damages Claim**.

Furthermore, despite the fact that the defendants seek summary judgment and the dismissal of the Amended Complaint, an award of summary judgment would not be dispositive in this case. If the Court determined that American General ratified the Policy and waive its right to rescission – which it should not – the only consequence is that American General would be barred from rescinding the Policy; American General would not be precluded from pursuing its remaining claims for exemplary damages, attorneys fees and costs based on the underlying fraud. Thus, not only is the defendants' motion premature and baseless, but it merely affects the type of relief that may be sought, and does not dispose of this case altogether.

22

## CONCLUSION

Based on the foregoing, it is obvious that defendants are attempting to evade discovery and avoid a finding of fraud based on an inapplicable technicality, in a case where blatant insurance fraud has taken place. As such, plaintiff's respectfully request that this Court deny the defendants' Motion for Summary Judgment in its entirety.


Dated:      White Plains, New York
            July 21, 2010

                        WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP

                                    By: s/Michelle Arbitrio
                                        Fred N. Knopf (FNK 4625)
                                        Michelle Arbitrio (MA 2137)
                                        3 Gannett Drive
                                        White Plains, New York 10604-3407
                                        Phone (914) 323-7000
                                        Facsimile (914) 323-7001


### Certificate of Service

Michelle Arbitrio hereby certifies, under penalty of perjury, that on July 21, 2010, I caused a true and correct copy of the foregoing to be served on the attorneys for the plaintiff at the address set forth below.

Ira Lipsius
Schindel, Farman, Lipsius
Gardner & Rabinovich LLP
14 Penn Plaza – Suite 500
New York, NY 10122


                                        ____s/Michelle Arbitrio_____
                                        Michelle Arbitrio
                                        Wilson, Elser, Moskowitz, Edelman
                                            & Dicker, LLP
                                        3 Gannett Drive

23

2830016.1

White Plains, New York 10604-3407
Phone (914) 323-7000, Ext. 4165
Facsimile (914) 323-7001